Anybody here for case number two? Come on up. Take your time setting up. Let me go ahead and call the case and then you can start when you're ready. Case number 20-14604, Charles Cooke v. Carpenter Technology Corporation. Ms. Mastando. Yes. May it please the Court. I am Terry Mastando and I represent the plaintiff appellate in this case, Cameron Cooke. The purpose of the Americans with Disabilities Act enacted by our Congress was to make sure that people, employees who have major disabilities or disabilities that qualify under the Act can return to work, can be an active member of the workforce as long as all they need is reasonable accommodation to do their job. We're here today because Mr. Cooke was working as an NDT operator for the defendant, Carpenter Technologies, a plant, when he learned after he started working there that he was diagnosed with three serious mental health related disabilities and they were severe depression, anxiety, and anorexia altogether. When he requested intermittent FMLA leave from his employer, they responded by, in our view, and we think the evidence supports, by violating two employment laws in the way they responded to his request for intermittent FMLA leave. The first law they violated was they internally converted his intermittent FMLA leave to continuous leave and simply told him that he was going to be off the schedule and sent him home for the balance of the three months of FMLA leave he was entitled to. Your contention there is, I guess, two or threefold. First, that he should have been given, as he requested, intermittent leave, right? Yes, that is exactly correct. And that the district court made a mistake in thinking that Mr. Cooke's affidavit conflicted irreconcilably with his deposition testimony. Yes, that's our position. The district court took the very brief deposition testimony of Mr. Cooke. You know, it was really, and I set it out entirely in the brief, it's very short, and the district court asked him specifically, I mean, the attorney asked him specifically how the application worked, and Mr. Cooke did testify to the best of his memory, he applied online, and that he was then taken off the schedule when he took leave. So that was a very brief, it's a very brief testimony. In his affidavit it just provides more detail. In his affidavit it does concede that, he says in the affidavit, I applied for FMLA. Just like he testified in his deposition, he applied online to the best of his knowledge. And so it's our position, of course, that those two statements do not really conflict at all, that his affidavit just describes more detail. You know, when you apply for FMLA online, the employee goes online and fills out what they need, and then the paperwork is then generated internally to be filled out by the physicians and by the employee, you know, by hand, not necessarily online. And so he just sort of provided in his affidavit a little more explanation of how that process worked. And when he tried to use his intermittent FMLA, he was called by Ms. Tranum, the HR person for Carpenter, and told, well, you know, we're taking you off the schedule, and you're going to need to apply for short-term and long-term disability. We think the record fully supports that Carpenter's plan all along, or their purpose, was to send him home and just have him draw long-term and short-term disability, even though he was actively requesting to return to work. So that's the crux of the FMLA claim. Did the online application facet of the leave require an employee like Mr. Cook to say what sort of leave he was looking for? I'm not sure there's anything in the record specifically about that, but that's generally. And if you look at the paperwork that was actually before the district court, which the district court chose not to really take into account, it was a part of Mr. Cook's deposition, you know, the letter that's generated as a result of what he inputted came back with, we've received your request for intermittent leave. So there's actually a letter in the record, you know, acknowledging that his initial application was for intermittent leave. It's also reflected in the internal notes for the company, Liberty Mutual, that a lot of times companies outsource their FMLA compliance, and that's what Carpenter did in this case. So there's notes generated by Liberty Mutual that show that the initial MC, they call it, but I think they're talking about the medical certification received, was for intermittent leave. So there is a lot of evidence in the record that the initial application itself, as Mr. Cook testified in his affidavit, was for intermittent leave rather than the continuous leave that Carpenter then required him to take. So that's the crux of that. And then, you know, they encouraged him and helped him file short-term disability, which he did. So it's, you know, that's the first contention that we have, that the record does support that Carpenter violated the FMLA by interfering with Mr. Cook's ability to take intermittent leave as long as he qualifies under the statute, which he did. So they allowed him or required him to take the continuous leave. And then the second thing that Carpenter did that we claim violated another law, which is the Americans with Disabilities Act, is that when he did try to come back to work, when he was without income, his short-term disability had ended, and they were no longer approving that, and his FMLA was gone, he tried to come back to work with very specific restriction in place, put in place by his physicians, that he not be required to work the rotating shifts that other employees at Carpenter, and he had been required to work before. So, you know, our position is that he came back with very reasonable restrictions in December. Actually, November is when he first tried to, he was taken off work in July, in June and July of 2017. He attempted to come back to work in December, and the lower court held basically, the lower court's decision should be overturned for two different reasons. The first reason is what I've already discussed, which is that, you know, there is a genuine issue of material fact that Carpenter unilaterally converted his request for intermittent FMLA leave to continuous leave in violation of that statute, and then the lower court also— But that goes to your FMLA claim, not to the ADA claim. Right. I know that there's some factual overlap, but they're distinct legal claims, are there not? Yes, they are, and they just sort of flow in time, in my own view. You know, initially it started with the FMLA violation, but I think it's also material to the Americans with Disabilities Act violation because it really makes it clear that Carpenter really did not want Mr. Cook on its premises, you know, due to his disability. To make sure I understand your arguments on appeal, with regards to the ADA, aside from asserting that Mr. Cook was a qualified individual, the one issue you've raised on appeal is that the court erred in various different ways by finding that it was Mr. Cook who failed to engage in the interactive process, right? Yes. That's the argument you've raised on appeal. Yes. The lower court actually found in its opinion that it was a request for reasonable accommodation and that, you know, so that part of the court's opinion we don't have any, obviously, concerns with. But on appeal, we're disputing the district court's finding that it was Mr. Cook, it was Carpenter, in our view, not Mr. Cook, that failed to engage in the interactive process, that there's a genuine issue of material fact there that a jury should decide. Because there are several factors that the district court did not take into account, you know, when it made its decision, and the first is that, you know, Mr. Cook first provided medical restrictions in December, December of 2018, and instead of bringing him back to work or trying to bring him back to work, they basically wouldn't take the restrictions. He submitted the restrictions, he offered to send them to the person he was talking to, mistrained him on the phone, he offered to give them to her, and she refused them. And he basically read them to her on the phone, and now it's Carpenter's position, I understand, that those restrictions were somehow confusing or not mandatory. But their own internal emails are contrary to that. Their own internal emails are clear that they fully understood that he was requesting a return to work with the restriction of not having to rotate shifts, that he could work one shift or the other, as long as he didn't have to rotate between the two. Now, my understanding of the record is that Carpenter, without making any promises for the future, offered to bring him back for 30 days without rotating shifts. Is that accurate? Yes, Your Honor. There was one phone call in which Mr. Cook was offered that accommodation, and that was during a meeting with his therapist. So it was, you know, everyone, Carpenter, Cook was fully participating in the interactive process at that point, and he had already been off work without pay at all, you know, for at least two months at that point, before they ever even offered that condition, that actual accommodation. And his therapist said we can't return him to work under those conditions with his current mental health issues. Okay, this is the part that I'm having trouble understanding from a practical perspective, maybe not from a legal one. But that 30-day offer was an offer for what he wanted, right? It's just not permanent. So why couldn't he go back under that 30-day offer and see if Carpenter extended it to be permanent? I mean, I would understand Mr. Cook's position from a practical perspective more if he had gone back without rotating shifts, and at the end of the 30-day period, Carpenter told him we can't offer this to you anymore. You've got to go back on rotating shifts. Then you've got a pretty solid claim, it seems to me, that there are at least issues of fact on whether or not Carpenter failed to provide a reasonable accommodation. But what do you do with the fact that he refused the 30-day offer, essentially? Well, in the record, it's clear that he refused that because it was his physician's recommendation that he not accept it with their ultimatum at the end of it. But why did the physician not? I haven't gone back into the record to read the individual documents that are there, so why did the physician say that was not something he should take? Well, that's really not clear in the record, but because of his mental health disorders, I know Mr. Cook felt that it was best to comply with what his physician was recommending because having to treat and handle medication for mental health issues, I'm assuming they felt it was more stressful on his mental health problems to have this hanging over him at the end of the 30 days, that he was going to have no choice but to quit at that point anyway. And then he might be giving up opportunities now to actually work and make money because Carpenter was not offering him an accommodation. On the record, it could be reasonable. Coming back without that restriction was a reasonable accommodation, so we have enough evidence to support that position also. So that's a very good question, and I don't know because it's not in the record. His testimony was that he wanted to abide by what his doctors thought he should do, and that's why he didn't end up going back or accepting that particular offer. And, of course, it's disputed in the record that they claim at the end that they offered him to come back with a wait-and-see at the end of 30 days, but their own notes, all the notes from that time period, all the emails, there's nothing in the documents that suggests that they ever told him that or that it was an option for him to switch shifts with someone else. What did he say was offered to him? He said that was offered to him during his therapist meeting. What was offered to him? What was the package deal offered to him? Come back, fill in the blank. What was it? He could come back and work one shift for 30 days, but the end of that shift he was already out of FMLA and he had no STD, no short-term disability, so he was going to have to quit at that point or he was going to have to find another job in the company that he could do, and that was his options. So according to him, the company didn't say, we'll reevaluate at the 30 days or we haven't made up our minds about whether this will be permanent or not. They just told him it's 30 days, limited to 30 days. After 30 days, you have to go back on rotating shifts. That's what he says? Yes, that's what he says, and that's what's in their notes. In the very last meeting he had, he had a phone call with Ms. Nelson and Mr. America, the plant manager. Her notes about that meeting, even though her notes clearly say that. Say what? I'm sorry. That that was the exact offer made to him, that there was nothing in those notes, and I can point to that in the record. I have a copy of it. There was never any offer in any of their notes when they summarized what they were going to offer to him about the option of reevaluating in 30 days. Like her notes specifically say, you know, he's got to be out of work for 30 days, but after that he's got to start rotating, and if not he's going to have to find another job in the company or be gone. I mean, her notes are not flexible, and to me that's just a complete dispute of fact. His version has always been that he was not given any option at the end of the 30 days. He felt like he needed to find another job because he could not count on the fact that he would have that job in 30 days after the expiration of his limitations. I mean, there's a combination. All right, thank you very much. You've saved your time for rebuttal. Good morning. Good morning, Mr. Davis. I'm Tom Davis for Carpenter Technologies. I'd like to, may it please the Court, I'd like to speak to the issue, first question about the FMLA interference, and I'd like to refer the Court to the record, Volume 2, pages 67 through 69, which would have a FMLA certification form completed by Mr. Cook, signed by his doctor, that says continuous leave is what was recommended, and the company followed this form. Didn't he apply for intermittent leave? He did, but that wasn't what the doctor recommended. That's an issue of fact. That's what I think the overarching problem is with your case, is that on both of these issues, and again I speak for myself only and not for my colleagues, you've got genuine issues of material fact. If, as Ms. Mustando says, and I haven't gone back to look at the underlying documents, so I could be wrong, but if there's a document generated through the computerized process based on his application that says that he's applying for intermittent leave, why isn't it an application for intermittent leave? That's not in the record. What's in the record is this. There's nothing in the record? No. What I'm referring to is Volume 2, pages 67 through 69, which has the application, and then it has the doctor's certification, which is what the company is obligated to follow, Your Honor, that says continuous leave from June 26 of 2017 to August 26 of 2017. Does it have his signature anywhere on it? Yes, it has his signature on the front and the doctor's signature below the continuous leave. What they're referring to, Your Honor, is a note, Volume 2, page 71, in the FMLA document dated 6-30-27, which says receive good medical certification on 6-28-17 on associate intermittent leave, but they don't refer to this specifically, APO, which is the physician, certified continuous leave from 6-26 to 8-26. These two documents that I've referred to in the record are the doctor's recommendation, which is what the company is obligated to follow. I know, but we're not— That's what they— Let me refer back to the district court. Not only did he— That's what he applied for. That's what the doctor certified. That's what the record shows. Moreover, the district court concluded the plaintiff applied for that leave. He took that leave. He took short-term disability benefits. I'm sorry to interrupt, counsel, but here's where I'm having a disconnect. He says he applied for intermittent leave, and the company, Carpenter, changed it to continuous leave. Is it your position that there's evidence showing that that's not the case? No, my position— The record reflects that the doctor's recommendation was— And I understand that. Right. But I guess my question for you is, is there anything that disproves his contention that he applied for intermittent leave, and it was the company that changed it to continuous leave? I don't see that in the record. I see the record reflecting what I've noted, which is a certification completed by him, a certification completed by his doctor, and the third-party administrator who administered the leave following the medical advice. And what the district lower court concluded was, the testimony was, I applied for the leave. I took the leave. I applied for short-term disability benefits. I was paid for that time when I was out. That's what the record reflects. But the district court— What the district court did was not engage in that analysis but simply say that there was an irreconcilable conflict between his affidavit and his deposition testimony. And the excerpt from the deposition is very, very brief. It's basically, did you apply for FMLA leave? And he says, yes, I did, through the computerized process. There's nothing else about what that consisted of. In that same exhibit to his deposition, which I took, this was an exhibit that he signed, and then on the third page, as I referred to, is the doctor's medical certification that shows unequivocally that the doctor recommended continuous leave. Then the lower court concluded— You asked him about that in his deposition? I did not ask him about this form. Right, which leads to the conclusion, I think, that the affidavit and the deposition were not in conflict, irreconcilable conflict with each other. Well, this was part of the record that the district court— It doesn't matter if that's part of the record. To exclude an affidavit at summary judgment under the Van Junkins line of cases, you've got to show that there's no way you can reconcile the earlier deposition with the later affidavit. I'm not sure that's the case here. As a matter of fact, you didn't make that argument below to the district court, right? They raised that in their reply, correct. But the record reflects— No, but you didn't ask the district court to exclude the affidavit. Correct, because— So it wasn't clear to you that there was an irreconcilable conflict. The record's undisputed that the company followed the medical advice. That's not my question, and not the point either. The question is not how— It seems to me the argument you're making is how do we square the record and figure out what the record shows? I get that. I think that's the right analysis. But the district court didn't do that. It stopped short of that by saying, I'm excluding the affidavit. The affidavit is irreconcilable with the deposition. I'm not considering what you're saying in the affidavit. That seems to me to be a problem. Maybe you're right that at the end of the day, once you sort through everything in the record, what he actually sought was full leave and not intermittent leave. But the district court didn't engage in that analysis because it didn't consider his affidavit. It struck it, essentially. Correct, Your Honor. However, the district court examined the facts on the ground, which was he applied for FMLA leave, and the record supports that, and the record supports that's what the doctor recommended. But here's the problem. If he still wanted to apply for intermittent leave and the company required him to apply for continuous leave or otherwise, I don't want to say tricked him into it, because I understand that's not what you did, but if he did not necessarily understand that he still had the option to apply for intermittent leave, then isn't that a problem? I mean, why not? No, because the record shows exactly what he applied for. The record shows exactly he got what he applied for. Except that he says that he thought he was applying for intermittent leave and that you all changed it to continuous leave. That's after the fact. He came up with that. But what the record reflects, Your Honor, with all due regard, is he applied. His own doctor recommended the leave he took. During that time period, the company paid for his insurance. He received short-term disability benefits. After those benefits expired, he applied for long-term disability benefits on his own, all suggesting that the doctor's recommendation that he couldn't work during this time period was pursuant to a doctor's recommendation. That's just simply not what the record shows. What the district court concluded was that his testimony was inconsistent. Underlying all that is the record evidence that shows that what the district court did was supported by the record, without a doubt. If you refer to the citations, it's undisputed that his doctor recommended two months leave. The ADA requires the company to follow the medical. There's a difference between what the company acts on and what he applies for. It's one thing to say the company acted properly because it acted on the doctor's recommendation. It's another thing to say that because the company acted properly, he necessarily applied for something they didn't get. Those two things don't jive with each other necessarily. He could have applied for intermittent leave, and you could have given him full leave based upon the doctor's recommendation. Those two things are fully consistent with each other. The district court didn't engage in that analysis because it struck the affidavit. The district court did strike the affidavit, but when you examine the record and look at the fact that Mr. Cook applied for short-term disability and was paid for that time period and subsequently applied for long-term disability benefits, which was denied in February, coincidentally, right around the time that he really wanted to come back to work, I just think that ignores the record evidence. You've got a short amount of time left. Let me shift you to the ADA claim, please, if I could. Viewing the evidence in the light most favorable to Mr. Cook, what did the company offer him in terms of a return without a rotating shift? In the light most favorable to him. They offered him the 30 days. With nothing after the 30 days. That's in dispute, correct. So in the light most favorable to him, it wasn't give us 30 days, work without a rotating shift, we're going to reevaluate, and we'll let you know at the end of the 30 days whether you can continue with a single shift. That's your position, but not his position. That's in dispute. Then how can you say, based on that, that it was Mr. Cook and not Carpenter that failed to engage in the interactive process? Okay, I've got a short amount of time here, but if you look at the record, on March 7th, I'll start at the end, he sends an email at volume 2, page 37, to the company. I hope to hear back from you as soon as possible. This is after, I'm going to walk you through this, okay, that's the email. March 7th, less than 12 hours later, volume 2, page 40 to 41, he resigns. Thank you very much. Now what happened before? So we're in March, let's move to February. On March 2nd to the 7th, there are conversations,  in dispute. What's not in dispute is, in February, he goes to see two more new doctors, Dr. Jones, or excuse me, Counselor Jones, and he's going to see Dr. Sargent, both in February. He's communicating this to the company. Okay, this is, I'm going to see more doctors. Coincidentally, which goes to the FMLA point, volume 2, page 46, his FMLA is denied. Excuse me, his long-term disability is denied. February 14th. On February 9th, conversations with his new doctor, Dr. Johnson. Not Dr. Alfrey, who signed the December medical information. He's seeing new doctors less than a month, right around this time period. They're collecting information. There's back and forth. Because you all asked him for a follow-up. I mean, didn't he originally submit two notes or something of that effect that said that he should, that they recommended that he not be on the swing shift, and then Carpenter asked him for further documentation because it said there was a conflict. Maybe I misunderstood, but that's. Well, volume 3, page 94 to 95, two medical notes that do not say that. Dr. Alfrey, who is out of the picture by 2018, recommends that he doesn't work swing shift. This is the conflict. Another doctor, nurse, said he would benefit from no swing shift. What's the conflict there? I mean, it seems like they're both. It's not required. So they said collect more information, and he does not submit the additional medical information. He goes to a new doctor, Dr. Jones, Counselor Jones, in March, and he does not submit any additional medical information until February the 22nd. That's the next time he submits medical information. And then he says on February the 15th, I'm going to see a whole new doctor, Dr. Sargent. This is ongoing. These notes are unclear, but there is certainly, Judge Jordan, in the Tyson case that we cite, she quits. Here, he quit during that process. We don't know what would have happened. I think your point to Ms. Mistando was a good one. Had he worked the 30 days and then said, what do you have for me now, that would be a different analysis. But he never did that. He just quit. Except that you've conceded that in the light most favorable to him, we have to assume that you didn't offer that, that you just said. But that's not, that's just, he's, that's, that, what the record shows and what the district court also said was he testified, he had talked to his doctor about looking for a new job in September. He had a new job when he quit. He started the next week. If you want to just ignore reality, correct, or ignore the record, but the evidence supports affirming the district court's order. Matt, do you have any other questions I can respond to? Nope. Thank you very much. All right, so let's pick up where Mr. Davis left off. So he says that after the 30-day offer was made, viewing it in the light most favorable to Mr. Cook, Mr. Cook sends an email saying I'm waiting to hear back from you and then resigns less than 12 hours later. Is he right about that factually? Well, it leaves a lot out. There were a lot of discussions and emails between those time periods. There was actually a phone call. In that 12-hour period? Within the 12-hour, no. He did send an email, I guess, hoping at the last minute he might hear something different from Carpenter. And that was in terms of time? How much before his 30-day period was supposed to start without a rotating shift? Well, he had been offering the 30 days and turned it down in the month of February. And all this was happening in March. So we're talking the end of February is when that discussion happened with his counselor where he was given the ultimatum, the 30 days or nothing at the end. So Mr. Cook is faced with the idea of either a job that might work within his restrictions and work within his medical condition that's somewhere besides Carpenter or only a guarantee of 30 days employment with Carpenter. So he was faced with that choice in that he had to make the choice that was best for his life based on the restrictions that Carpenter was putting on his return, which we, of course, claim was not a reasonable request for accommodation. And we think you cannot view that in the vacuum of all of his many efforts beginning in November the year before to try to give them restrictions and get them to comply with them. I mean, he first gave him these restrictions in December, and then now finally in the month of February they're offering him 30 days with no guarantee beyond that. He'd been without income for almost four months at that point and really had, I mean, of course we say it over and over, but he had no choice but to find another job, you know, a job that might last more than 30 days, which was all that Cook was offering him. And we think all of these issues, and just to underscore, and one of the things I was planning to say is just to point you to the record, which is Ms. Nelson's contemporary in her notes in its document 28-7, you know, page 59 of that volume. And her notes say, while you have restrictions, you can work one shift for 30 days. If you still require shift restrictions during that 30 days, you can apply for any open position within the company or outside the company. If none are available, you will need to go back out until you have no restrictions. I mean, that is not a flexible position, and Mr. Cook was faced with that choice. Our position, of course, under the ADA, that does not meet the reasonable accommodation requirement, and it can't be viewed outside of his real life, which is that he had to have a job that would last him more than 30 days to support himself. What about—I'm sorry to interrupt, but what about—I want to give you a chance to address that. What about going back to the FMLA claim and your friend's argument that your client went ahead and signed the application seeking continuous leave? Actually, it's a little more complex than that, and the paperwork is weird in FMLA claims. His initial application can be found as a—it's part of one of the exhibits in his deposition, but it's document 28-4 in the district court record, page 65, and he originally signs the section to be completed by employee first, right? And that form itself shows a request for FMLA for a year. Like, it doesn't say intermittent on the form, but the time period above his signature is for an entire year. So you can't have FMLA for an entire year unless it's intermittent. Okay, and so that's our position. The form that he signed, you know, shows that year. And then the internal letter, and I have that, too. The internal letter he received acknowledging that application was dated July 21st of 2017. It's found at document 28-4, page 70 of 105, and the correspondence type at the top is called intermittent leave acknowledgement. And it says the leave was requested to begin on August 17th of 2017 and end on December 31st of 2018. Again, that's an entire year period, which cannot be anything but intermittent leave, as acknowledged by this actual letter, you know, acknowledging his receipt. So we think the record fully supports that he initially requested intermittent leave and that we can quibble and argue over what the internal records, the FMLA records show, you know, as far as the medical certification and whether these notes within the system mean that they received a medical certification for intermittent and then rejected it and got another one for continuous leave. You know, there's documents like that. But as Your Honor pointed out, you know, we didn't get to that point. We didn't get to discuss whether or not the, you know, Carpenter actually, I'm sorry, I'm over time. Keep going. Finish up. We didn't get to discuss whether Carpenter actually, you know, did do what, you know, my opposing counsel suggests, which is he's requested intermittent, but the doctor says he has to have continuous, so we're going to have to do what the doctor says. We never got to quibble over what those documents within the FMLA record mean. Well, let me ask you this quick question. Are there any documents from Mr. Cook's end, emails, letters, phone logs, et cetera, complaining or contesting the company's decision to give him full FMLA leave as opposed to intermittent FMLA leave? No, Your Honor. There's nothing like that in the record. He did what his company instructed him to do. That's the way he viewed it is they were telling him this is what he had to do. All right. Thank you both very much. Thank you.